## IN RE DISBARMENT OF JOHN G. PRIEBE.[1]

February 9, 1940.

No. 32,043.

[1]Reported in 290 N. W. 552.

*Oscar G. Haugland* and *R. B. Reavill,* for State Board of Law Examiners.

*Maurice A. Hessian* and *John J. McKasy,* for respondent.

HOLT, JUSTICE.

Respondent is 52 years of age. He is a graduate of the North High School of Minneapolis and of the University of Minnesota and its law school, and was admitted to practice law in this state in 1910. Ever since his admission he has practiced his profession in the city of Minneapolis. He is married and has four daughters, three of whom have attended the University of Minnesota, and the youngest has entered Junior North High School.

In the fall of 1932 respondent became interested with one C. H. Kavalaris in a restaurant operated in quarters leased from Walker-Pence Company, a corporation, in its building on Eighth street and Hennepin avenue, Minneapolis. The restaurant was known as the Silver Tray. The lease was executed and acknowledged September 14, 1932, for a five-year term, rent payable monthly in advance. The rent per month increased after the first six months so that it was $180 per month in June, July, and August, 1933. It appears that prior to June 29, 1933, the Minneapolis Catering Company incorporated and took over the Silver Tray restaurant, and on that date respondent became the owner of all its stock. Kavalaris assigned the lease to the catering company, and Walker-Pence Company, in writing, accepted the catering company as lessee, releasing Kavalaris. On the same date respondent and his wife executed a promissory note for $1,000, due

in six months from that date with interest at six per cent per annum, payable to the order of Walker-Pence Company, and, to secure payment thereof, executed a mortgage upon a lot owned by respondent in north Minneapolis. The mortgage was not filed for record until April 4, 1934, after an action to recover on the note had been dismissed by Walker-Pence Company without prejudice. On April 27, 1934, summons with complaint attached was served on respondent and his wife in an action by Walker-Pence Company, plaintiff, to foreclose the mortgage for default in the payment of the note. Respondent and his wife interposed a joint answer admitting the execution of the instruments but alleging want of consideration. Plaintiff made no move for trial until in November, 1937. November 17, 1937, respondent, by a new attorney, served an amended answer which admitted that respondent executed the note and mortgage, denied that the wife did, and averred that neither defendant received any consideration for the note and mortgage. The amended answer further alleged that, subsequent to the delivery of the note and mortgage, plaintiff agreed with defendant John G. Priebe that if he, Priebe, would desist from forcing the catering company, the then lessee, into bankruptcy and would procure a tenant satisfactory to plaintiff, it would cancel the note and mortgage; that John G. Priebe did desist from putting the catering company into bankruptcy and found a tenant for the Silver Tray restaurant who was accepted by plaintiff. The trial of said foreclosure suit was had November 30, 1937, before the court (the Honorable Levi M. Hall) and a jury, at which trial respondent testified that he signed his wife's name to the note and mortgage, then exhibited to him, and also testified to two conversations had with Archie D. Walker, the president of plaintiff, the Walker-Pence Company, in the latter part of July, 1933, substantially as alleged in the amended answer. Mr. Walker also testified and denied flatly that either conversation took place. The only issue submitted to the jury was whether respondent had the two interviews with Walker which he testified to and which Walker denied. Their special

verdict was the answer "No." The court filed findings that Myrtle C. Priebe, respondent's wife, did not execute the note and mortgage, adopted the special verdict, and directed that judgment be entered against respondent alone and the premises described in the mortgage be sold and applied on the judgment. The judgment entered December 10, 1937, for $1,487.60, which included $50 attorney's fees, taxes, and costs, was paid in full by respondent December 20, 1937.

In this proceeding two charges of misconduct are made against respondent, *viz.*: (a) That he committed perjury when he testified on November 30, 1937, that he signed his wife's name to the note and mortgage in question; and (b) that he committed perjury on the same day when he testified to having had two interviews with Mr. Walker in the latter part of July, 1933, relative to the cancellation of said instruments. The matter is before us upon the report of the referee, the Honorable Vernon Gates, a judge of the district court, appointed to take the testimony and make findings. The referee's findings are that respondent was guilty of wilful perjury as to each accusation. Respondent challenges both as not warranted by the record.

We adopt and sustain the finding of the referee that respondent, in testifying at the trial that he signed his wife's name to the note and mortgage, testified to what he then knew to be false. Respondent now admits that his wife personally signed both instruments, but claims that at the trial, four years and five months after the signing took place, he was in such physical and mental exhaustion from overwork, worry, and sorrow that his memory and mind did not function normally, and that when he gave his testimony he honestly believed that he had appended his wife's name to the two instruments. In the joint answer interposed in May, 1934, in the foreclosure suit, there was an admission of due execution by both. The first time the wife's execution of the note and mortgage was made an issue was by the joint amended answer interposed November 17, 1937. The note and mortgage are here. They were exhibits in the foreclosure suit, and respondent

had them before him when he gave his testimony. A mere glance at the two signatures would furnish conclusive proof to anyone, except perhaps some professional handwriting expert, that respondent did not sign his wife's name to the instruments. And we cannot understand how the referee could find that plaintiff's attorney was convinced that respondent's testimony was true; nor is it understandable how the trial court could so find; but that is of no materiality in this proceeding. Of course perjury means not only testifying under oath to what is untrue, but that the one so testifying knew and appreciated at the moment of giving the testimony that it was false and untrue. But, even assuming that respondent at the time he verified the amended answer labored under the honest belief that he had signed his wife's name to the note and mortgage, it seems to us that by interposing such a defense respondent excludes himself not only from those entitled to practice law, but also from the ranks of the ordinarily honest person. Respondent thereby virtually confesses to having deliberately issued and uttered forged legal obligations. We think the finding must be sustained that defendant wilfully and knowingly testified falsely when, at the trial before Judge Levi M. Hall on November 30, 1937, he testified that he and not his wife signed her name to the note and mortgage then exhibited to him.

In reference to the charge that respondent, in testifying that he, in the latter part of July or first part of August, 1933, had two conversations with Archie D. Walker pertaining to the defense alleged in the amended answer, committed perjury, our examination of the record leads to the conclusion that the referee's finding that respondent so did is not sustained. The painstaking care of the referee, manifest both in the findings and in the attached memorandum, has been noticed and is appreciated. At the same time, the record discloses facts which must be taken into consideration when it is to be determined whether or not the accused lawyer has been guilty of a felony. Mr. Walker was the only witness produced to prove this charge. He gave his testimony herein almost six years after the interviews, testified to by

respondent, took place. He admits that he as well as his son often patronized the Silver Tray at lunch time, and that he knew and had spoken to respondent. Mr. Walker was an exceedingly busy man with large interests in this state and on the West Coast to look after and manage. He left the negotiations in respect to the lease here involved and its transfer from the original lessee to the Minneapolis Catering Company to his son and the employe Hodge. Mr. Walker, after denying that he, in the latter part of July, 1933, at the Silver Tray restaurant, had such conversations as respondent had testified to, answered the following question in this manner:

Q. "I will ask you whether or not you ever had any conversation with Mr. Priebe having to do with the Minneapolis Catering Company lease or the Walker-Pence property?

A. "I have no recollection of it. I frequently ate lunch with him but I have no recollection.

Q. "Did you at any conversation at any time discuss with Mr. Priebe the matter of releasing him from liability on the note and mortgage?

A. "No, I did not. * * *

Q. "Did Mr. Priebe at any time or place ever tell you that he had improved these premises by putting in a new front?

A. "Not that I recall.

Q. "Did he tell you that he had put beautiful wall paintings on the walls which could not be removed?

A. "I don't remember it.

Q. "Did he tell you he had put in plumbing that had not been there before?

A. "Not that I remember. * * *

[On cross-examination.]

Q. "When is the first time that you learned that Mr. Priebe was interested financially in the Silver Tray?

A. "I couldn't answer that question. * * *

Q. "Did you know it in 1933?

A. "I presume so but I couldn't say definitely."

Walker then testified that he did not negotiate the original lease though he executed it and knew of its existence, that he knew that Kavalaris had sold, and to respondent, and that he knew in July or August, 1933, that Priebe had sold out to Mr. Vierling, but stated that about then he spent much time in California, and had quite a lot to do with reshaping the finances of the Red River Lumber Company. He had something to do with Vierling when he left the premises, and knows that most of the improvements remained when he went out and the original lessee, Kavalaris, again took over the Silver Tray. This Mr. Vierling was a witness for respondent in this proceeding but was not a witness in the foreclosure suit. If he had been, it is more than likely that the special verdict would have been "Yes" instead of "No," for Mr. Vierling corroborates respondent as to respondent's talks with Mr. Walker in the latter part of July, 1933. It stands to reason that a man of vast enterprises involving large sums cannot carry in his mind the details of to him the small transactions usually left to the negotiations of subordinates. He testified that he did not know what the rent of the Silver Tray was but stated it was a "slight rent"—it was then $180 a month. To respondent the disastrous venture in which he had embarked loomed large and must have registered upon his memory more durably than upon that of Mr. Walker as to what took place with reference thereto. Respondent is to a certain extent corroborated by this in the record. He testified that no rent was due June 29, 1933, when the lessee Kavalaris was released from the lease by Walker-Pence Company and the catering company was substituted as lessee. The note and mortgage were therefore not given for rent due, but to guarantee the payment of future rent by the catering company. Vierling testified that after he purchased Priebe's stock or interest in the catering company and it was sued in unlawful detainer in February, 1934, the rent then claimed due and unpaid was about $800. Respondent sold out to Vierling August 9, 1933. There is nothing to show any rent then unpaid. The rent was $180 per month in advance. The foreclosure action

was neither brought nor tried upon the theory that the note and mortgage were given to guarantee the future payment of rent under the lease—there being no finding of rent due and unpaid. Another fact corroborating Priebe is that he testified that at the time of the alleged conversations with Walker the latter told him that the mortgage was not recorded, and, if it was all the same to Priebe, it would be destroyed instead of giving a satisfaction. The mortgage was not recorded until April 4, 1934. There is also another fact disclosed by Vierling's testimony that goes far to establish that the foreclosure suit enforced an unjust claim against respondent, as he contends. Vierling testified that when, in March, 1934, he surrendered the premises leased, Kavalaris, the original lessee, again took possession of the Silver Tray and was then accepted by Walker-Pence Company as lessee. Mr. Vierling took over the Silver Tray August 9, 1933, and he testified that just prior thereto, at a conversation between Priebe and Walker, when Priebe told Walker that he intended to put the catering company into bankruptcy, Vierling, who was then Priebe's manager, interrupted with, "Let me have a swing at this, I think I can pull this thing out." That thereupon Priebe and Vierling went up to Walker-Pence Company's office above the Silver Tray and talked with the agent, Mr. Hodge, in regard to the matter. Vierling proposed to give security for the rent by his father, who lived in Shakopee, giving a $1,000 mortgage to Walker-Pence Company to relieve Priebe; that he gave the abstract of the Shakopee property to Hodge; that Hodge went to Shakopee and was satisfied with the security. Evidently the mortgage was not given, and Vierling, being unable to pay the rent, the unlawful detainer suit was instituted. Vierling agreed to vacate before the trial of that suit, and he testified that Hodge asked him if he was willing to turn over the property in the restaurant in full payment of all rent, and Vierling told him that he was. The property Vierling estimated worth between $1,200 and $1,500, viz., fixtures, signs, boiler, gas plate, neon lights outside costing over $400. That Vierling at Hodge's request went to Walker-Pence

Company's lawyer, the one who tried the foreclosure suit, where he signed a document transferring all the property in the Silver Tray, and he was to have a receipt for all rent, but never got it. Vierling's testimony stands uncontradicted. Of course the fact that there was no unpaid rent when the foreclosure suit was brought does not justify or excuse respondent for his perjury, if any, in defending; but we think the above facts should be called to attention. Respondent, without asking for a stay in the foreclosure suit, paid in full the judgment rendered for $1,487.60. In the hearing at this proceeding there seemed to be some dispute as to whether, at the trial of the foreclosure suit, it was changed by consent into an action for a money judgment against respondent alone. The judgment entered is the ordinary foreclosure judgment to be rendered against the actual mortgagor, respondent being the only one, since the court found that his wife did not execute the mortgage, the attorney's fees, $50, stipulated in the mortgage, were allowed, and it was decreed that the property be sold. No judgment was docketed and could not be until after the sale, and then only for the deficiency, if any.

We are not required on this record to find that either respondent or Mr. Walker wilfully and knowingly testified falsely in the foreclosure suit or in this proceeding respecting the two disputed conversations in the latter part of July, 1933. It is more likely that neither one after the lapse of more than four years could accurately recount what then occurred or was said. But we think Mr. Vierling's testimony does show that respondent is in all probability right in respect to such interviews taking place.

It is also true, and the referee so found, that there was evidence that respondent was not in normal condition in the summer and fall of 1937. In June of that year he broke down and became hysterical when arguing a motion before Judge Selover. In July, while actively engaged as president of his church to celebrate the fiftieth anniversary of the pastor's service there, the pastor, to whom he was much attached, suddenly died. After consulting with his doctor, respondent went to California for a

six weeks' vacation. The day he returned his father suffered a stroke and died the next day. Later in the fall his former partner, Thomas Lattimer, for whose reëlection as mayor of Minneapolis he had unsuccessfully campaigned, unexpectedly died. Respondent's wife was in poor health, and one of his daughters had to undergo an appendix operation. All this tended to distract respondent at the time and for two weeks prior to the trial of the foreclosure suit. This is not recited as justification or excuse for the amended answer in the foreclosure suit or his testimony therein that he and not his wife executed the note and mortgage. If he was in fact so concerned about his wife's health and desired to shield her from the excitement attendant upon being a witness, he certainly ought to have realized that to deny that she executed the instruments involved would most likely cause her to be subpoenaed by plaintiff in the action. That neither she nor the notary who took her acknowledgment was called to testify is still a mystery to us, having in mind the experience and capacity of plaintiff's attorney.

The referee, after finding that at the time respondent testified in the foreclosure suit he was and for some two weeks prior thereto had been laboring under the impression that he had signed his wife's name to the instruments mentioned, and that he had had the interviews with Archie D. Walker referred to, finds that this impression should have been dispelled when the signatures on the note and mortgage were exhibited to him at the trial. We think this conclusion of the referee may well apply to his testimony with respect to his wife's signatures, but such exhibition of the signatures does not seem to us to affect his recollection in respect to the disputed interviews with Mr. Walker. This criticism of respondent by the referee is no doubt justified by the record, that the impression above referred to "was the product of settled habits of impulsive, emotional thinking, careless handling of facts, faulty preparation of cases for trial, and an extravagant partisanship."

As to respondent's testimony that he signed his wife's name to the documents so often herein referred to, we must sustain this finding of the referee:

"That ordinary consideration of the signatures and acknowledgment on the note and mortgage when they were called to Priebe's attention on the witness stand during the trial of said foreclosure action would have disclosed to him the truth regarding his wife's signature on said instruments; that his mind was sufficiently clear at that time to have enabled him to have given said instruments, the signatures and acknowledgment on them such consideration; that he failed to exercise such care, that said failure was caused by the disposition and mental habits above described and constituted a violation of his oath as a witness."

From the foregoing we conclude that respondent, John G. Priebe, in the trial of the foreclosure suit mentioned, on November 30, 1937, when called as a witness therein, testified falsely that he signed the name of his wife to the note and mortgage then exhibited to him, when in truth and fact he then knew that she personally signed the same; and the order of the court is that respondent be disbarred from the practice of law for the period of one year from the entry of judgment herein, with leave, at the end of such year, to apply to this court for reinstatement.

Let judgment be entered accordingly.

STONE, JUSTICE (dissenting).

By far the most disagreeable part of our function is presented by these occasional proceedings for the discipline of attorneys. For us, being human, their repugnance is increased somewhat in proportion to the general good standing of the accused and our acquaintance with him. In view of the interdependence of bench and bar, it could not be otherwise. Both the demand for merciful treatment and the opportunity for its abuse are necessarily present.

More than in any other class of cases, it is not only disagreeable but painful to oppose anybody's view that in a given case

justice should be tempered with mercy. But in this case my submission is that the tempering "quality of mercy" is being strained to the breaking point of justice. It is not necessary in order that justice be achieved that decisions should stubbornly follow a pattern of consistency. But any marked and unexplained abandonment of consistency in a given line of decisions naturally suggests that somewhere along that line there has been injustice, and that decision has leaned too far one way or the other. In In re Application for Removal of Schmidt, 154 Minn. 539, 191 N. W. 939, we disbarred because the accused had been convicted of subornation of perjury. That was in 1923, and we have never considered that Mr. Schmidt should be readmitted. In In re Disbarment of Gennow, 206 Minn. 389, 289 N. W. 887, opinion filed December 8, 1939, there was no evidence of crime; yet there was disbarment. In many other cases presenting much less of offense against law and ethics than that of which Mr. Priebe is found guilty we have found no reason why the result should be anything less than disbarment.

To me it seems somewhat irrelevant that Mr. Priebe is found guilty of one charge of perjury and not guilty of the other. One such offense is, in my opinion, enough. Concerning that one, I am not at all impressed by his attempted explanation and extenuation.

Perjury is bad enough in any case. When the perjurer happens to be a lawyer, it becomes aggravated to the extreme. Feeling that there is no reason why Mr. Priebe should escape the result usual in these cases, I must, with great regret, register my disagreement to the extent just indicated.

LORING, JUSTICE, and JULIUS J. OLSON, JUSTICE (concurring in the foregoing dissent).

We concur with the views expressed by Mr. Justice Stone.